IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:11-cv-80427-DMM

| | |
|---|---|
| Steven A. Sciarretta, as trustee of the Barton Cotton Irrevocable Trust a/k/a the Amended and Restated Barton Cotton Irrevocable Trust,<br><br>        Plaintiff/ Counterclaim Defendant,<br><br>v.<br><br>The Lincoln National Life Insurance Company,<br><br>        Defendant/ Counterclaim Plaintiff/ Third-Party Plaintiff,<br><br>v.<br><br>Sanford Muchnick, an individual, and as trustee of the Barton Cotton Irrevocable Trust,<br><br>        Third-Party Defendant. | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF/THIRD PARTY PLAINTIFF THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S MOTION FOR A RULE TO SHOW CAUSE WHY THE COURT SHOULD NOT IMPOSE SANCTIONS <u>AGAINST NON-PARTY IMPERIAL PREMIUM FINANCE, LLC</u>**

## INTRODUCTION

The involvement of Imperial Premium Finance, LLC ("Imperial") with this case stems from its extension of a premium financing loan to the Barton Cotton Irrevocable Trust (the "Trust") which was used to pay premium for life insurance policy JJ7033333, formerly insuring the life of Barton Cotton in the amount of $5 million (the "Cotton Policy"). In its affirmative defenses and counterclaim [D.E. # 7], Lincoln alleged that this premium financing loan was the centerpiece of a scheme orchestrated by Imperial and others to procure the Cotton Policy at no out-of-pocket cost to Mr. Cotton or his family, with the intent that the Cotton Policy would later be transferred to Imperial or another investor, who would then profit upon Mr. Cotton's death. Moreover, Imperial provided the Trust with a loan to cover its litigation expenses associated with this litigation, a loan that would only be repaid if the Cotton Policy was deemed valid. Imperial's loans to the Trust – totaling over $1.6 million – would be repaid only if the Trust was successful at trial. Accordingly, although it was a non-party witness, Imperial had a direct financial interest in the outcome of this case – an interest which motivated Imperial to conceal evidence and obstruct Lincoln's efforts to determine the full nature and extent of the policy-related transactions at issue.

At deposition and trial, Imperial produced John Norris as its corporate designee. Mr. Norris is not an officer, director, or employee of Imperial and had no personal knowledge regarding Imperial or its business. Imperial chose to produce Mr. Norris as its designee because it claimed that it could not produce any employee knowledgeable about its business due to a pending federal investigation into its business practices. As a corporate entity, however, Imperial is not entitled to refuse to provide testimony on the grounds of a privilege against self-incrimination, and therefore, was required to produce a knowledgeable witness in accordance with Federal Rule of Civil Procedure 30(b)(6) – even if that meant educating its unaffiliated

witness on the topics of testimony requested by Lincoln, as this Court expressly required Imperial to do in its November 23, 2012 Order granting in part Imperial's Motion for a Protective Order.[1]  Imperial utterly failed to fulfill its duty to educate Mr. Norris, deliberately refusing to provide him with relevant, probative information regarding facts and documents important to Lincoln's case.  Imperial did so in bad faith and in an attempt shield the sordid details of this premium financing transaction from the jury and the Court.

There can be no serious dispute that Imperial, by providing testimony at deposition and trial, substantially participated in this litigation and in the transactions giving rise to the litigation.  Nevertheless, Imperial disregarded this Court's order compelling it to provide responsive deposition testimony and disregarded the trial subpoena requiring it to provide responsive trial testimony.  Imperial made a deliberate decision to provide its corporate designee with a significantly limited amount of information in order to increase the chances of a jury verdict favorable to the Trust, which would mean repayment of the premium and litigation financing loans extended by Imperial to the Trust.

---

[1] On November 22, 2011, Imperial filed an emergency motion seeking a protective order or a stay of the litigation due to Imperial's alleged inability to produce a knowledgeable witness because of the wide-ranging criminal investigation Imperial was facing.  Before Lincoln could file its response, the Court denied Imperial's request, holding that:

> "[i]t is undisputed that Imperial, as a corporation, does not have a Fifth Amendment privilege against self-incrimination, and thus it must provide a corporate representative for a deposition. . . . However, 'this court cannot compel individuals to testify in their corporate capacity if they otherwise have an individual privilege that can properly be invoked. [Imperial], however, can be compelled to answer the questions through an agent who will not invoke the privilege.  This includes, if necessary, retaining a person not previously associated with the corporation so that the person can answer the questions.'"

Order granting in part Mot. For Protect Order, at 2-3 [D.E. # 50] (quoting *City of Chicago, Ill. v. Wolf*, No. 91 C 8161, 1993 W L 177020 at *1 (N.D. Ill. May 21, 1993); citing *Martinez v. Majestic Farms, Inc.*, No. 05-60833-C1V, 2008 W L 239164 at *2 (S.D. Fla. Jan. 28, 2008); *Securities and Exch. Comm'n v. Mut. Benefits Corp.*, No. 04-60573-C1V, 2008 W L 239167 at *3 (S.D. Fla. Jan. 28, 2008)).

Imperial's conduct in preparing and producing its corporate representative is deserving of sanctions. Due to Imperial's bad faith, Lincoln was deprived of important evidence that was material to Lincoln's claims and defenses at both the summary judgment and trial stages of this case. Indeed, Imperial's effort to present only self-serving testimony was so apparent and egregious that the Court, at trial, stated, "I think Imperial's conduct in the underlying facts and in the way they've handled themselves in this litigation raises serious questions. The witness was blatant in his failure to follow the rules in terms of a designated witness, the research he did. I mean Imperial's playing a driving – well, they are a major factor in the litigation, yet they hid behind that witness." Trial Trans. Day 4, 3:8-15, Exh. 1 to Declaration of Nolan B. Tully, Esq. ("Tully Decl.").[2]  Given Imperial's bad faith, Lincoln requests that the Court issue an order to show cause why sanctions should not be imposed disgorging Imperial of some or all of the insurance policy proceeds that would otherwise be applied to satisfy Imperial's loans.

## **LEGAL STANDARD**

Imperial, as a non-party appearing in front of the Court, is subject to the Court's inherent power to impose sanctions on a non-party for its bad faith conduct. *See Helmac Prods. Corp. v. Roth (Plastics) Corp.,* 150 F.R.D. 563, 568 (E.D. Mich. 1993). With respect to the origins of the inherent powers of the Court, the United States Supreme Court has stated:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (citing *Hudson*). For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821); *see*

---

[2] The Tully Decl. is attached as Exhibit A to this motion.

> *also Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874). These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

The Eleventh Circuit has held that "[t]he key to unlocking the inherent power of the Court is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998); *see also Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001); *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995); *Allapattah Srvcs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005). Bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order. *Chambers*, 501 U.S. at 46. In determining whether sanctions should be awarded under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *Rothenberg v. Sec. Mgmt. Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984).

## ARGUMENT

The testimony of Imperial's corporate representative both at deposition and at trial in this action was fundamentally deficient. Mr. Norris was utterly unprepared to address the key issues in this case and his unpreparedness deprived Lincoln of important evidence in support of both its claims and its defenses in this litigation. Indeed, Mr. Norris' testimony itself highlights the fact that Imperial did nothing to educate or prepare Mr. Norris before presenting him as its corporate representative to give deposition and trial testimony.[3] Instead, Imperial dumped a "document

---

[3] Q. And what did you generally do to prepare for your testimony in this case?
  A. For the – for my deposition, I reviewed the document population that was provided, looked at the subpoena that I believe you referenced earlier. There were 18 topics. Reviewed the document population with regard to those subpoena topics, asked questions of counsel and of Imperial personnel to prepare myself for that deposition. Then I was deposed. Subsequent to that, I read the deposition, gave corrections, which is a normal procedure, and in

(Continued)

population" which included over 20,000 pages on Mr. Norris and relied on him to review those 20,000 pages and determine what he deemed material.

Further, Mr. Norris is no ordinary corporate representative. Mr. Norris has no personal knowledge of the facts of this case,[4] is not employed by Imperial,[5] and has no experience with premium financing generally or transactions like the one at issue in this case.[6] These circumstances did not, however, excuse Imperial from its obligation to prepare Mr. Norris to testify about Imperial's involvement with the Cotton Policy. *See QBE Ins. Corp. v. Jorda Enterprises, Inc*. 277 F.R.D. 676, 689 (S.D. Fla. 2012). Imperial completely disregarded its burden to prepare Mr. Norris. As a result, Lincoln, the Court and the Jury were left to wonder

---

(Continued)
preparation for trial, I reread my deposition and the attached exhibits. Trial Trans. Day 3, 142:2-12, Tully Decl., at Exh. 2.

[4] Q. And you have no personal knowledge of the Imperial premium finance loan in connection with the Lincoln policy that was issued on the life of Barton Cotton?
A. I have personal knowledge dating to my involvement with the case. It was not contemporaneous with the issuance of the loan.
Q. Okay. You understand one of the issues in this case pertains to an Imperial loan, right?
A. That is correct.
Q. You had no personal involvement with Imperial or that loan at any time prior to this litigation?
A. That is correct.
Q. And in fact, you only become involved within the last couple of months; isn't that correct?
A. I believe it was December of last year. Trial Trans. Day 3, 141:6-20, Tully Decl., at Exh. 2.

[5] Q. I understand, however, that you're not an employee of Imperial, right?
A. That is correct.
Q. And you've never been an employee of Imperial?
A. That is correct. Trial Trans. Day 3 141:1-5, Tully Decl., at Exh. 2..

[6] Q. Do you know what non-recourse premium financing is?
A. The company has not given me any information on that.
Q. Was Imperial aware at any time of any corporate policy at Lincoln that addressed non-recourse premium financing?
MR. WESTERLIND: Objection. Outside the scope. Go ahead.
A. I'm not aware that -- I have no understanding of what Lincoln -- excuse me, what Imperial knew about Lincoln's understanding.
Q. Do you have an understanding what non-recourse premium financing consists of?
MR. WESTERLIND: Objection. Outside the scope.
A. As a corporate representative I have no idea. Norris Dep., 28:24-29:18, Confidential Doc. #25 [D.E. # 71].

whether there were others at Imperial who could explain the key facts and documents related to the Cotton Policy. *See Catalina Rental Apts., Inc. v. Pac. Ins. Co.*, No. 06-20532, 2007 WL 917272, (S.D. Fla. Mar. 23, 2007). Imperial's failure to prepare Mr. Norris was done in bad faith and in violation of Federal Rule of Civil Procedure 30(b)(6), this Court's Order denying Imperial's Motion for a Protective Order [D.E. # 50], and the trial subpoena served on Imperial. Consequently, monetary sanctions should be imposed upon Imperial.

In determining whether to impose sanctions against a non-party, courts have applied the following test: sanctions are appropriate and warranted if the non-party has "a substantial interest in the outcome of the litigation and . . . substantially participate[d] in the proceedings in which he interfered." *Helmac Prods. Corp.*, 150 F.R.D. at 568; *see also Feldman v. Davidson*, No. 05–61760, 2009 WL 995473, at *2 (S.D. Fla. Apr. 13, 2009); *Anchondo v. Anderson, Crenshaw & Assocs, LLC*, No. 08–202, 2011 WL 4549279, at *6 (D.N.M. Sept. 29, 2011); *Bartos v. Pennsylvania*, No. 08-366, 2010 WL 1816674, at *4 (M.D. Pa. May 5, 2010). The circumstances relating to Imperial clearly satisfy the test articulated by the court in *Helmac*.[7]

### I.   IMPERIAL HAS A SUBSTANTIAL INTEREST IN THE OUTCOME OF THIS LITIGATION

Imperial cannot reasonably dispute that it had a substantial interest in the outcome of this litigation. When one considers the consequences that Imperial would have suffered had the

---

[7] At trial, the Court recognized the damage that was done by Imperial throughout this litigation and the events leading up to it. The Court stated that:

> "Imperial's playing a driving – well, they are a major factor in the litigation, yet they hid behind that witness. According to him, none of the employees would give him any information. Whether you can do that is really questionable in my mind and so, I do want to consider sanctions against Imperial and its witness. And so I invite the parties to look at the issues and determine what would be appropriate steps to take. I've never seen a witness behave quite the way he did. Make no effort to invest – he was designated as the most knowledgeable person, yet didn't make any effort to gather any facts."

Trial Trans. Day 4, 3:12-22, Tully Decl., at Exh. 1.

Policy been found void *ab initio*, it is clear that Imperial had at least as great a stake in the outcome of the litigation as the Trust.  First, Imperial had a monetary stake in the outcome of this litigation that was well in excess of one million dollars.  Imperial's monetary interest in this litigation stems from two separate loans Imperial made to the Trust – the original loan made to the Trust to finance the premium payments for the Policy, and a subsequent loan made to the Trust to finance the instant litigation.  Repayment of both of these loans was contingent on the Trust being funded, and since that the Trust's only asset was the Policy, the only way Imperial would be repaid was from the proceeds of this litigation.[8]

The existence of Imperial's two separate loans to the Trust meant that Imperial had a substantial amount at risk in this litigation.  In the Parties' joint pretrial stipulation, the Trust sought recovery of attorneys' fees, which it claimed would likely be in the range of $1 million after trial.[9]  Additionally, although Imperial was not able to provide either the Court or Lincoln with the precise amount that the Trust owed to Imperial on the premium finance loan, Imperial testified that the amount owed, as of December 1, 2011, was approximately $641,000.  This $641,000 was inclusive of interest and fees owed to Imperial, although Imperial was unable to

---

[8] Mr. Rousseau:  Does Imperial claim any rights in that policy with respect to any other claims that it has? You claim a lien on it, for example?
  Mr. Norris:  The only rights it has to the policy are to the extent of its recovering – its collateral position for principal and interest on the loan and other subsequent agreements that were reached with the trust.
  Q.  And I believe it's Imperial's position, is it not, sir, that for the first dollars that come into this trust with – in connection with collecting this policy, those dollars have to go to Imperial to pay off the loan it made to finance the policy, right?
  A.  That is correct.
  Q.  And after that loan gets paid off, the next dollars that come in have to go to Imperial to pay off the loan Imperial has made to pay the lawyers to try the case, right?
  A.  In general, yes.
  Q.  Okay. And those loans have to be paid out of the proceeds of this litigation, correct?
  A.  That is correct.  Trial Trans. Day 3, 172:17-173:11, Tully Decl., at Exh. 2.

[9] In response to the Court's questioning at trial, Mr. Norris testified that Imperial did not know the amount of the attorneys' fees, but made sure to point out that the Trust would owe the amount of the attorneys' fees over and above the premium financing loan amount.  Trial Trans. Day 3 180:17-20, Tully Decl., at Exh. 2.

provide the Court with an explanation of the amount of interest and fees charged by Imperial.[10]
At a minimum, Imperial had $1.6 million riding on the Jury's verdict on the validity of the
Cotton Policy. Consequently, Imperial plainly had a substantial interest in the outcome of the
litigation and a significant incentive to provide its corporate designee solely with exculpatory
evidence while permitting Mr. Norris to remain unaware of any facts that might harm Imperial's
financial interests.

## II.     IMPERIAL SUBSTANTIALLY PARTICIPATED IN THE PROCEEDINGS

Imperial was involved in attempts to procure life insurance on the life of Barton Cotton
beginning in at least October 2007 – more than seven months before the application for the
Policy was submitted to Lincoln. Given that Lincoln's claim in this case was that the Policy
lacked an insurable interest at inception, the facts and circumstances pre-dating the inception of
the Policy are of the utmost importance because they would evidence that the Cotton Policy was
procured as a wagering contract in violation of Florida law. *See* Order on the Parties' Motions
for Summary Judgment, at 10 [D.E. # 119]. Further, Imperial produced over 20,000 pages of
documents pursuant to a subpoena issued by Lincoln – clear evidence of the scope of Imperial's
role in the transactions and machinations surrounding the Cotton Policy. Finally, Imperial,

---

[10] THE WITNESS: The principal balance, I believe, is the 335,000.
THE COURT: Interest?
THE WITNESS: Is – takes it up to – the number I had as of December 1 of last year was, the total outstanding was, I believe, $641,000 and the difference in that is interest.
THE COURT: Are there fees?
THE WITNESS: The fees -- I would have to -- I think the fees are part of that difference as well.
THE COURT: Part of what difference? The difference –
THE WITNESS: The difference between the 641 and 355.
THE COURT: Well then, how much is interest?
THE WITNESS: Can I have a pencil? It's 641 minus, let's say 33, which will put you to 608. And the interest will be down to the 335.
THE COURT: So, total?
THE WITNESS: Less from the 608.
THE COURT: Are total fees 33,000?
THE WITNESS: I believe. I would have to, I would be more comfortable researching that in greater detail. I apologize for not having that. Trial Trans. Day 3, 179:15-180:11, Tully Decl., at Exh. 2.

pursuant to Lincoln's validly issued subpoena, produced Mr. Norris to testify at deposition and at trial in this action. *See* Subpoenas Directed to Imperial by Lincoln, Tully Decl., Exhs. 3 and 4. Courts have found that a non-party's obstructive conduct or its offer of incomplete or misleading testimony at a deposition or at trial has evidenced a substantial participation in the proceedings sufficient to justify the imposition of sanctions. *See Helmac Prods. Corp.*, 150 F.R.D. at 566; *Bartos*, 2010 WL 1816674 at *7.

### III. IMPERIAL'S CONDUCT OVER THE COURSE OF THIS LITIGATION WAS EGREGIOUS AND WARRANTS SANCTIONS

Imperial's testimony in this case – both at deposition and trial – amounted to a blatant attempt to improperly shield harmful facts from Lincoln and the Court, presenting a skewed and one-sided picture of its involvement with the Policy. Imperial completely failed to prepare Mr. Norris to provide deposition testimony, and even more egregiously, after his deposition failed to educate him on the documents and topics that Imperial now knew were material.

After presiding over a week-long trial, the Court is familiar with the salient issues in this case. Lincoln's theory of the case is that the Policy was procured pursuant to an artifice or scheme to obtain the Cotton Policy with the intent that it would ultimately benefit an investor lacking an insurable interest in Mr. Cotton's life. Lincoln marshaled in discovery and presented at trial a number of documents that corroborated this theory – many of them produced by Imperial. Nevertheless, Imperial's witness was unprepared to answer questions about these documents and other facts that supported Lincoln's theory of the case. When it came to documents and evidence supporting the Trust's theory of the case, however, Imperial's witness was well prepared and forthcoming with his testimony. There is ample evidence in both Imperial's deposition and trial testimony of the extent to which Imperial purposely shielded harmful testimony from disclosure by: (i) producing a corporate designee with absolutely no

knowledge of Imperial or its premium financing business; and (ii) refusing to provide him with any information other than that which was helpful to the Trust's (and therefore Imperial's) case.

### A.  Imperial's Deposition Testimony

Specifically, Imperial's corporate designee claimed that "he was not educated" and had no knowledge regarding the following topics at his deposition:

- The reason behind an October 2007 email from Wealthmodes to Imperial relating to Barton Cotton (*see* Norris Dep., at 39:23-40:6, Confidential Doc. #25 [D.E. # 71]);

- The purpose of an Imperial form titled "premium financing indication of interest" that was generated by Imperial on February 12, 2008, more than three months before the Cotton Policy was issued by Lincoln (*see id.* at 45:11-18);

- The purpose and intent behind many of the documents relating specifically to the Cotton Policy that were generated by Imperial in the months before the premium financing loan was finalized (*see id.* at 93:15-98:13);

- The purpose for the amended and restated Cotton Trust agreement and the circumstances surrounding its drafting, despite the fact that the amended and restated trust agreement was required as a precondition to the Imperial premium finance loan (*see id.* at 119:12-21;

- Important details about the loan that Imperial extended to the Cotton Trust, including why there was an "insured/borrower contribution" of $5,000, the basis for the origination fee of $33,506.67 charged by Imperial, and the calculation of the interest charged to the Cotton Trust (*see id.* at 128:16-20; 129:16-130:18; 142:20-143:25);[11]

- The mechanics of what was to happen in the event of a loan default and what rights Imperial had with respect to the collateral for the loan in the event of a loan default (*see id.* at 152:18-153:3);

- The purpose of certain documents that Imperial required Mr. and Mrs. Cotton to sign prior to issuing the premium finance loan, including a limited power of attorney signed by Mrs. Cotton, a "Hold Harmless Agreement" signed by Mr. Cotton, and a "Security Agreement" signed by Mrs. Cotton (*see id.* at 162:1-163:5; 163:7-20; 170:3-171:10);

---

[11]  In his testimony regarding the calculation of the interest on the Imperial loan to the Cotton Trust, Imperial's designee testified that Imperial gave him no information whatsoever about the amount of interest was calculated. Nevertheless, Mr. Norris testified that he believed that that Imperial was charging the Cotton Trust the appropriate amount based on a calculation he did on his own, on a piece of paper that he then conveniently threw away. Norris Dep. 145:11-5, Confidential Doc. #25 [D.E. # 71].

- The reason why Imperial required representations as to the Cottons' net worth and whether or not the Cottons were offered a financial inducement to obtain the Policy prior to extending premium financing to the Cotton Trust (*see id.* at 176:23-177:24; 178:4-24);

- The reason why Imperial required a representation that the policy application had been completed accurately with no material omissions or misstatements (*see id.* at 179:11-19);

- Why Felcher and Wealthmodes were required to pay a $206,325.74 fee to Imperial prior to Imperial extending the premium financing loan to the Cotton Trust (*see id.* at 192:19-194:14);

- What Imperial meant in its internal emails requesting that the Policy be prepared "for market" months before the premium financing loan maturity date (*see id.* at 197:21-25; 202:1-3; 203:12-204:18; 220:17-22);

- What Imperial meant in its September 1, 2010 letter to the Cotton Trust asserting that it was the equitable owner of the Cotton Policy and was entitled to all benefits from the Policy (*see id.* at 234:10-24).

Moreover, to ensure that Mr. Norris would not offer Lincoln anything more than the most basic information about Imperial's involvement with the Cotton Policy, Imperial's designee was consistently prompted by his counsel – who also served as counsel for the Trust – to not offer information to Lincoln if the company had not "educated" him on that particular point. On at least ten occasions throughout Imperial's deposition, counsel for Imperial and the Cotton Trust cautioned Imperial's designee regarding a pending question by asking the designee "[w]ere you educated to the answer to this question?" *See* Norris Dep. at 49:7-25; 64:11-25; 98:6-13; 101:7-25; 102:7-23; 162:18-163:5; 176:23-177:14; 202:22-203:5; 206:18-207:2; 211:24-212:9, Confidential Doc. #25 [D.E. # 71]. Indeed, on several of these occasions, Imperial's designee started to answer a question with some candor when he was chastised by counsel for Imperial and the Trust. *See* Norris Dep. at 49:7-25; 64:11-25; 98:6-13; 102:7-23; 176:23-177:14; 206:18-207:2, Confidential Doc. #25 [D.E. # 71].

The fact that counsel for Imperial and the Trust had to so carefully limit Mr. Norris' testimony to the material on which Imperial had educated him raises serious questions about the amount of material that Imperial did not educate its designee on.  It also serves as clear evidence that Imperial did not comply with the Court's directive in its Order on Imperial's Motion for a Protective Order [D.E. # 50] and the requirements of Federal Rule of Civil Procedure 30(b)(6) in preparing a witness with knowledge of the information relevant to facts at issue in this litigation.

### B. Imperial's Trial Testimony

The testimony of Imperial's corporate designee at his deposition plainly evidences Imperial's failure to properly prepare its witness.  Perhaps even more egregious, however, is Imperial's complete failure to prepare its witness to testify at trial in response to a trial subpoena, even though Imperial had learned from the deposition what questions and documents were important in this case.  *See* Trial Subpoena Directed to Imperial by Lincoln, Tully Decl., Exh. 4.  At trial, Imperial's designee admitted that he did absolutely nothing to cure the deficiencies in his deposition testimony between his deposition and the trial in this action.  Trial Trans. Day 3, 141:6-20, Tully Decl., Exh. 2.  In fact, all Mr. Norris did to prepare for trial is review his deficient deposition testimony once again and look at the exhibits used at his deposition.[12]  It is abundantly clear from Imperial's trial testimony that no witness preparation took place and Mr. Norris was afforded no further education on the relevant topics.  In fact, Imperial's trial testimony was incomplete, combative and self-serving.

---

[12] Imperial failed to educate Mr. Norris on the topics that arose at Imperial's deposition despite counsel for Imperial and the Trust representing to Lincoln that that "[t]here are individuals at [Imperial] available to educate the witness regarding many of the documents" upon which Mr. Norris was examined at Imperial's deposition.  Norris Dep. 171:7-10, Confidential Doc. #25 [D.E. # 71].

In particular, Imperial failed to provide its corporate designee with relevant, probative information regarding the following topics:

- Whether an email dated October 24, 2007 from Wealthmodes to Imperial was submitted by Wealthmodes in connection with the premium financing loan through which Imperial paid premium for the Cotton Policy (Trial Trans. Day 3, 145:20-23, Tully Decl., Exh. 2);

- Why Imperial's employees were directed to set a "purchase date" in placing the premium finance loan that was two years from the policy issue date (*id.* at 151:14-24);

- The outstanding amount of the premium finance loan, including how the amount was calculated and how much of that amount was principal and how much was interest (*id.* at 154:19-155:9);

- The personal guaranty document that was signed by Barton Cotton as a precondition to Imperial's issuance of the premium financing loan – a document that Imperial itself attempted to portray as evidence that the premium financing transaction was legitimate (*id.* at 158:8-14);

- Why Imperial required certain representations and warranties from Dennis Felcher prior to issuing the premium finance loan, including representations that no funds had been advanced to the insured to pay premium for the Policy, no misstatements or omissions appeared in the application for the Policy, and that Cotton's net worth and finances had been accurately represented to Lincoln (*id.* at 159:2-160:22);

- What Imperial meant in Imperial emails directing Imperial employees to put the Policy "out to market" (*id.* at 165:7-166:4).

When examining Imperial's deposition testimony side-by-side with its trial testimony, it is clear that there were certain documents and topics on which Imperial deliberately decided not to provide substantive testimony – even after being put on notice via Lincoln's deposition examination that the information was material to the issues in the case. Indeed, there could be no other explanation for the inability of Imperial's designee to provide testimony on matters directly relevant to the transactions at issue. The failure of Imperial and its witness to make any effort to gather relevant facts was so blatant and deliberate that the Court was "offended at their conduct" and found Imperial's "conduct in this [litigation] totally unacceptable." Trial Trans. Day 4, 159:9-160:1, Tully Decl., Exh. 1..

Lincoln was prejudiced by Imperial's conduct at deposition and at trial. Imperial's failure to provide its corporate designee with material information requested by Lincoln's deposition and trial subpoenas deprived Lincoln of important testimony regarding material facts and documents. Given Imperial's substantial financial stake in the outcome of the litigation and its substantial participation in the litigation, its bad faith conduct in offering testimony at deposition and at trial warrants sanctions. *See Bartos*, 2010 WL 1816674, at *8-9.

### IV. AS A SANCTION FOR ITS CONDUCT, IMPERIAL SHOULD BE DIVESTED OF SOME OR ALL OF THE PROCEEDS FROM ITS LOAN TRANSACTIONS

Having shown that Imperial's conduct in this litigation is deserving of sanctions, the determination of the measure of such sanctions rests in the sound discretion of the Court. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers* 501 U.S. at 44-45. The Court's discretion is not without boundary, however, and should be guided by "the basic tenet that sanctions should always be narrowly tailored to meet the misconduct" perpetrated by the sanctioned party. *Bartos*, 2010 WL 1816674, at *6 (citing *Klein v. Stahl, GMBH & Co., Maschinefabrik*, 185 F.3d 98 (3d. Cir. 1999)).

It is clear that Imperial's conduct in this litigation represents a grave abuse of the judicial process. Indeed, on the final day of trial, the Court stated "I have never seen a witness behave as that witness did and so, I would like to know if either party is interested in trying to figure out a sanction I could impose against him individually or the company. I'm interested in at least exploring it. I think they did damage throughout, and the jury findings, I think, support that in terms of what happened in this case." Trial Trans. Day 4, 159:16-22, Tully Decl., Exh. 1. Imperial's bad faith conduct warrants a significant sanction, both in order to deter Imperial from acting in a similar fashion in other lawsuits and to compensate Lincoln for the harm it has

suffered as a result of being deprived of Imperial's full and honest testimony regarding the facts at issue in this litigation. To achieve these purposes, Lincoln submits that the most appropriate sanction the Court could fashion would be to divest Imperial of some or all of the insurance policy proceeds that would otherwise be applied to satisfy Imperial's loans. This sanction should be awarded to Lincoln to partially compensate Lincoln for the harm inflicted by Imperial in obstructing these judicial proceedings.

Lincoln submits that this sanction is appropriate because it will adequately punish Imperial, while at the same time preserving the balance of the policy proceeds that may ultimately be payable to the Trust pending the resolution of post-trial motions and any appeal.[13] If and when Lincoln is required to pay the death benefit to the Trust, the Trust must repay Imperial's two outstanding loans before any money is distributed to the Trust. Trial Trans. Day 3, 172:17-173:11, Tully Decl., at Exh. 2.[14] Therefore, imposing this sanction on Imperial will harm only Imperial, and will not impact any monies that would be paid to the Trust and its beneficiaries after the Trust satisfies its obligations to Imperial. Absent the imposition of a significant monetary sanction, Imperial (i) will profit from its obstruction of this judicial proceeding; and (ii) will be undeterred from engaging in similar future misconduct, which

---

[13] Lincoln has filed a motion for judgment as a matter of law seeking relief from the Jury's verdict. Pending the resolution of that motion, Lincoln does not concede that any amount of the death benefit is payable to the Trust, as the Cotton Policy is void *ab initio* as a matter of law.

[14] Lincoln is unable to articulate the precise amount that it suggests would be an appropriate sanction because neither Plaintiff nor Imperial has been able to offer any evidence as to the exact amount that the Trust owes to Imperial for the litigation financing loan and/or the premium financing loan. Imperial's witness was examined on this point directly by the Court at trial, and was unable to provide the Court with the amount of principal, interest, or fees that are currently owed by the Trust to Imperial pursuant to the premium financing loan. Trial Trans. Day 3, 179:9-181:7, Tully Decl., Exh. 2. Therefore, in connection with a show cause order issued by the Court to Imperial, Lincoln respectfully requests that Imperial be compelled to provide the Court and the parties with a full accounting of the amounts owed by the Trust to Imperial, including a breakdown of the principal, interest and fees associated with each amount and how each of those amounts were calculated.

is far from speculative.  Illustrative of this second point, in response to a deposition subpoena served on Imperial in another stranger-originated life insurance ("STOLI") case – *Brad Balmuth, as Trustee of the Joan M. Russo Irrevocable Life Insurance Trust Dated January 15, 2009 v. Lincoln National Life Insurance Company*, No. 3:11-cv-00742-AET-TJB, United States District Court for the District of New Jersey – Lincoln was recently informed that Imperial and its counsel, Arent Fox, intend to produce Mr. Norris as its 30(b)(6) witness yet again.  *See* Affidavit of Nicole C. Wixted, Esq., attached as Exhibit B.

## CONCLUSION

For the foregoing reasons, Lincoln respectfully requests that the Court grant this motion and issue an order requiring Imperial to show cause why sanctions should not be imposed against Imperial for its conduct during this action.

## Local Rule 7.1 Certification

I hereby certify that counsel for the movant has conferred with all non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues but has been unable to resolve the issues.

Dated:  April 27, 2012

s/Wendy L. Furman<br>
Wendy L. Furman, Esq.<br>
PETT FURMAN, PL<br>
2101 N.W. Corporate Blvd., Suite 316<br>
Boca Raton, FL 33431<br>
(561) 994-4311<br>
(561) 982-8985 fax<br>
wfurman@pettfurman.com

- 18 -

        Of Counsel:

        Charles J. Vinicombe Esq. (*pro hac vice*)
        Michael D. Rafalko, Esq. (*pro hac vice*)
        Nicole C. Wixted, Esq. (*pro hac vice*)
        Nolan B. Tully, Esq., (*pro hac vice*)
        Drinker Biddle & Reath LLP
        One Logan Square
        Suite 2000
        Philadelphia, PA  19103-6996
        (215) 988-2700

        *Attorneys for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff The Lincoln National Life Insurance Company*

## CERTIFICATE OF SERVICE

I certify that on April 27, 2012, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

>Thomas L. David
>THOMAS L. DAVID, PA
>4800 LeJeune Road
>Coral Gables, FL 33146
>305-371-6600
>305-667-8015 (fax)
>td@davidcapital.com
>
>Julius A. Rousseau (*pro hac vice*)
>James M. Westerlind (*pro hac vice*)
>Eric Biderman (*pro hac vice*)
>Arent Fox, LLP
>1675 Broadway
>New York, NY 10019-5820
>212-484-3900
>rousseau.jule@arentfox.com
>westerlind.james@arentfox.com
>biderman.eric@arentfox.com
>
>*Attorneys for Plaintiff Steven A. Sciaretta, as trustee of the Barton Cotton Irrevocable Trust, and Third Party Defendant Sanford L. Muchnick*

I further certify that on April 27, 2012, a copy of the foregoing was served via electronic mail on:

>Julius A. Rousseau (*pro hac vice*)
>James M. Westerlind (*pro hac vice*)
>Eric Biderman (*pro hac vice*)
>Arent Fox, LLP
>1675 Broadway
>New York, NY 10019-5820
>212-484-3900
>rousseau.jule@arentfox.com
>westerlind.james@arentfox.com
>biderman.eric@arentfox.com
>
>*Attorneys for Imperial Premium Finance, LLC*

I further certify that a copy of the foregoing was served via personal service on the following and an affidavit of service will be filed with the Court upon confirmation of service.

>Imperial Premium Finance, LLC
>701 Park of Commerce Boulevard, Suite 301
>Boca Raton, FL 33487

>s/Wendy L. Furman
>Wendy L. Furman